(94 South. 577)

### LOUISVILLE & N. R. CO. v. RUSH.
### (6 Div. 718.)

(Supreme Court of Alabama.   Oct. 26, 1922. Rehearing Denied Dec. 7, 1922.)

I. Appeal and error ☜1005(4)—Rule as to granting of new trial by Supreme Court, on ground that verdict is against preponderance of evidence, stated.

Refusal to grant a new trial on ground that verdict was contrary to the great preponderance of the evidence will be reversed if,

after allowing all reasonable presumptions in favor of the correctness of the verdict, the preponderance of the evidence against the verdict is so decided as to involve the conviction that it is wrong and unjust.

2. Railroads ☜327(5)—Traveler must stop and look in both directions.

One approaching a railroad track on which cars and locomotives are likely to be running must stop and look in both directions and listen before going thereon.

3. Railroads ☜346(1)—Burden of issue of wanton injury on plaintiff.

In an action for damage to an automobile, where it was claimed that the railroad's negligence in operating the train at an excessive speed and in not signaling its approach to the crossing, constituted wanton conduct, the burden of proof was on the plaintiff.

4. Railroads ☜348(11)—Evidence held not to prove wanton injury at crossing.

In an action for damage to an automobile, where it was claimed that the railroad's negligence in operating the train at an excessive speed, and in failing to signal the train's approach to the crossing, constituted wanton conduct, evidence held not to sustain verdict for the plaintiff.

5. Railroads ☜348(8) — Evidence held to prove negligence in not looking and listening for train.

In an action for damage to an automobile struck by a train at a crossing, evidence held to prove that the accident was caused by the recklessness of the automobile driver in attempting to cross the track without looking and listening for approaching trains.

Appeal from Circuit Court, Jefferson County; J. C. B. Gwin, Judge.

Action by Harold Rush for damages against the Louisville & Nashville Railroad Company. From a judgment for plaintiff, defendant appeals. Transferred from Court of Appeals under Acts 1911, p. 449, § 6. Reversed and remanded.

Huey & Welch, of Bessemer, for appellant.

Wantonness cannot be imputed or inferred; it must always be proven. Wantonness cannot exist, unless there is a consciousness of the wrong done. 164 Ala. 171, 51 South. 324; 197 Ala. 81, 72 South. 356; 196 Ala. 77, 71 South. 457. It is the duty of the driver of an automobile to stop, look, and listen for an approaching train at a place where he can see or hear the train before going upon a crossing. 172 Ala. 560, 55 South. 223; 201 Ala. 308, 78 South. 84; 192 Ala. 474, 68 South. 343; 204 Ala. 535, 86 South. 396. If the automobile was driven onto the railroad track in such close proximity to the oncoming train as to render averting the injury impossible, plaintiff cannot recover. 166 Ala. 575, 51 South. 961; 204 Ala. 535, 86 South. 396. The jury is absolute-

ly bound by the law given them by the trial court, whether correct or not, and if they ignore the law so given them, the verdict, on motion, should be set aside. 199 Ala. 28, 73 South. 979; 74 South. 939; 182 Ala. 640, 62 South. 113; 126 Ala. 244, 28 South. 423; 134 Ala. 388, 32 South. 744; 205 Ala. 529, 88 South. 855.

Goodwyn & Ross, of Bessemer, for appellee.

Where the engineer is looking ahead, and one approaching in dangerous proximity to the track may be seen by the engineer, it may be reasonably inferred by the jury that the engineer in reality did see such person in peril, notwithstanding the engineer may deny that he saw such person. 172 Ala. 597, 55 South. 812; 179 Ala. 239, 60 South. 933; 189 Ala. 604, 66 South. 581; 186 Ala. 110, 65 South. 153; 172 Ala. 588, 55 South. 252, 35 L. R. A. (N. S.) 420; 144 Ala. 317, 42 South. 45.

GARDNER, J. A four cylinder Buick automobile belonging to the appellee was practically demolished by one of the passenger trains of the appellant railroad at a road crossing in the village of what is known as Old Jonesboro, situated a short distance out from Bessemer. Suit was instituted to recover damages therefor, resulting in a judgment for the plaintiff, from which the defendant has prosecuted this appeal.

The complaint originally contained several counts, all of which however were eliminated, with the exception of count 5 designated as the wanton count. It is there charged: That the plaintiff's automobile was being driven across the track of the railroad at a public road crossing in the village, and at a point where the public— including a large number of people and vehicles—customarily and frequently crossed the track, and where people, automobiles, and other vehicles were likely to be in a position of peril on said track in crossing the same. That the crossing was at the end of a sharp curve in the track, around a high embankment, so as to obstruct the view of the crossing of those in charge of the train until within about 100 feet thereof. That the defendant's agents or servants, knowing the presence of vehicles were likely to be then and there at said crossing in a position of peril, and that injury to persons and property thereon would probably result from the running of the train across said crossing at a high and dangerous rate of speed, did, in reckless disregard of the probable consequences, wantonly run said train at a high and dangerous rate of speed, without any signal of the approach thereof, across said crossing, and the damages resulting were as a consequence of such wanton conduct.

The foregoing is but the substance of the material averments of this complaint, without any effort at any particular description thereof. Numerous questions as to pleading, evidence, and the refusal of written charges are presented in the assignments of error and argued in brief of counsel for appellant; but we pretermit a consideration thereof, in view of the conclusion which we have reached upon the merits of the cause as presented by the proof.

[1] It is strenuously insisted by counsel for appellant that the judgment should be reversed on account of the action of the court in refusing a new trial upon the ground the verdict was contrary to the great preponderance of the evidence. This insistence on the part of counsel for appellant is given but scant, if any, consideration by counsel for appellee in their brief. But we are persuaded, after a most careful study of the evidence as presented by this record, that the motion for new trial should have been granted upon this ground. As said by this court in Southern Rwy. Co. v. Grady, 192 Ala. 515, 68 South. 346:

"We recognize that upon questions of this character much deference is to be accorded the views of the trial judge, and that the powers of this court in this regard should be exercised with the greatest caution. Courts are organized that justice may be evenly administered, and if, after allowing all reasonable presumptions in favor of the correctness of the verdict of the jury, the preponderance of the evidence against the verdict is so decided as to involve the conviction that it is wrong and unjust, then it is the duty of the court to so exercise its power and grant the new trial."

A detailed discussion of the evidence will serve no useful purpose, but, in view of the reversal, we make brief comment thereon. The accident occurred between 3:30 and 4 p. m. on May 6, 1920. The train was about on time, running from Bessemer south toward Tuscaloosa. Plaintiff himself was not in the car, but it was being driven by a young man, Henry Rush, plaintiff's brother, with whom was another boy. The public road runs for quite a distance parallel with the railroad. At the crossing at Jonesboro there is a road leading from the main highway, which crosses the track, out to several houses—going across the branch and going back into the main highway. While it does not appear to be a public road in the sense of having been kept up by the county, yet it has been in use by the people generally for more than 30 years. From the point where this road leads from the main highway to the railroad crossing is something over 100 feet. Henry Rush, the boy driving the car, testified that he imagines he was running about 15 miles per hour when he was driving on the public road parallel with the railway, but that his speed decreased when he turned toward the crossing and that he in fact had gone into low gear (though his car had not stopped) and at the

time his car reached the track it was only running five or six miles per hour. The front end of the car seems to have gotten over the first rail of the track, and young Rush and his companion saw the approaching train in time to jump from the car and escape injury. Rush states that he and his companion were talking, and that he looked for the train when he was five or six feet from the track, and that one would have to be five feet from the crossing to see the train 100 feet away, due to the fact there was a cut at its highest point not exceeding ten feet deep and varying down to three feet and then on to a level of the track. As soon as he saw the train he made an effort to stop his car placing it in "neutral" and putting on the brakes. All this happened "pretty quick," to use the language of the witness, and he was of course greatly disturbed and confused. He gives as his opinion that the train was running 40 or 45 miles an hour, and that the bell was not rung or the whistle blown; that when the train stopped the back end of it was about 400 feet from the crossing. While he gives his judgment as to the speed of the train, yet he further testified that he did not take time "to time the speed of the train."

It appears from the proof there are about two houses in the immediate vicinity of this crossing, but in the community there are some 75 or 100 houses; and it may be conceded that the testimony as to the use of this crossing suffices to bring this case within the influence of the populous crossing decisions, although it appears that this was but a village and what is known as a flag station at the time of the accident. No other vehicle was attempting to cross and no person at the crossing. The witness for the plaintiff, Miss Alma Clements, testified as an eyewitness to the accident, and gave her opinion that the train was running about 45 or 50 miles per hour, but upon cross-examination she stated that she did not know how fast trains usually ran and had no judgment thereon, saying:

"I don't know how I determined how fast this train was running. The truth of the business is I was just guessing at it. * * * The way I fix my judgment is that all trains usually run about the same. All trains do not go the same speed; some of them go slow, but they usually go about 45 or 50 miles an hour."

Her testimony also shows that the collision was "like a flash"; but she did not notice whether the bell was rung or the whistle blown.

[2] It is well settled by our decisions that one attempting to cross a railroad track on which cars and locomotives are likely to be running must stop and look in both directions and listen before going thereon. Hines v. Cooper, 205 Ala. 70, 88 South. 133; A.

C. L. R. Co. v. Jones, 202 Ala. 222, 80 South. 44.

That the driver of this car drove the same upon the track in violation of this well-settled rule is without dispute, and the trial court properly eliminated all counts seeking recovery as for simple negligence. The testimony of Henry Rush and Miss Alma Clements is that upon which the plaintiff must largely rely for recovery. From his own testimony we think it quite clear that young Rush had no time and was in no frame of mind to form any judgment as to the speed of the train; and the quotation from the testimony of Miss Clements suffices to demonstrate that her opinion upon this question was of very little value and based purely upon guesswork.

Numerous photographs were taken of the scene of this accident, showing the crossing, the cut, and the condition of the track at this place. There is also in evidence a diagram drawn by one of the county engineers who made actual measurements. The county engineer took actual measurements as to the distance one could be seen down the track toward Bessemer, first, where the road turns from the main highway toward the railroad. He testified that at this point a man could be seen 520 feet up the track; he then moved 20 feet nearer the railroad and one could be seen 572 feet up the track; he then moved closer to the railroad, about 62 feet therefrom, and at this point one could be seen 672 feet from the crossing, and from 43 feet from the track one could be seen 713 feet from the crossing, and something like 22 feet from the track a man could be seen standing between the rails 1,093 feet from the crossing. The whistle post and yard limit post are within view from this crossing, and are quite a distance from the cut toward Bessemer. The evidence of this engineer also discloses that the curve in the railroad is some distance before the cut is reached, and that in the cut and coming toward the crossing there is very little curve. He places the distance from the crossing to the cut at 300 feet; some of the witnesses place this distance at something like 125 feet. The photographer testified as to the location of the camera in taking the different photographs as well as to their correctness. These witnesses, so far as appears from this record, are without interest in this litigation, and all of this proof utterly refutes the statement of Henry Rush that one had to be within five or six feet of the track to see the train toward Bessemer. The cut at its deepest point evidently does not exceed 10 feet in depth. The embankment merely had grass or vines growing thereon, and we are persuaded that the view at and near this crossing up the track toward Bessemer was not obstructed for several hundred feet, and that for this distance the track, so far as

vision was concerned, had in it no curve of any material consequence.

As to the speed of the train, it is shown that Jonesboro is a flag station, and it is the duty of the engineer to keep a lookout to see if any one is at the crossing to become a passenger, as well as to await signals from the conductor for any one to alight at this point. For this purpose the testimony of the engineer discloses that it is necessary that the train be run so as to be kept within control so that a service stop may be made. He testified that he blew the whistle for the station and the crossing, and that the bell was rung, and that he—as was his custom—reduced the speed of his train, and about a train's length from the crossing discovered that no one was there, increased the speed of his train, and, at the time he reached the crossing, was running about 20 or 25 miles per hour. He did not see the automobile, nor did the fireman who was firing the engine at the time, and, as the automobile approached the track from the side away from the engine, his view was therefore obstructed when he neared the crossing by his engine. His testimony as to the speed of the train was corroborated, not only by the employés of the railroad on the train at the time, but also by one Alex Park who was a passenger, and who appears to be entirely without interest in the result of this litigation. He remembers looking out of the window and seeing this automobile as it was running on the public road parallel with the railroad, and he noted the fact it was running faster than the train. He noticed the automobile as he was riding through the cut, and his view was not obstructed. He gives as his opinion that the train was running about 20 or 25 miles per hour. The distance the train ran beyond the crossing after the accident is variously estimated by the witnesses; but, in view of the fact that it appears the engineer made a service stop and not an emergency stop of the train, we cannot attach so much importance as do counsel for appellee to that particular phase of the proof, and as serving as a contradiction of the great weight of the evidence as to the speed of the train at this time. That the usual signals of approach for the station of this crossing were given, was testified to by the engineer, the fireman, conductor, and others in the employ of the railroad, and corroborated by two witnesses, Annie and John Posey, who were standing near a mail box near the county road at the time, and the only witness testifying to the contrary is young Rush, the driver, whose evidence upon all material questions presented is in direct conflict, not only with numerous witnesses, but with the physical facts as disclosed by the photographs in evidence.

[3] In cases of this character, the burden of proof is upon the plaintiff. The wanton count upon which the plaintiff seeks to recover is dealt with and described in the recent case of L. & N. R. R. Co. v. Porter, 196 Ala. 17, 71 South. 334, where this court said:

"But in its concrete illustration of wantonness, such as would justify a verdict against defendant under the first count, the court dealt with wrong of a character different from that to be inferred from the facts we have mentioned as being of possible finding from the evidence. It dealt exclusively with that character of wrong which rests upon an inference of reckless indifference to the probable consequences of a probable situation, the wrongdoer, the engineer, in this case, being charged with knowledge, not that some person is at the time in a position of actual, imminent danger, but with knowledge, based upon previous observation or information, of the probability that some person will be exposed to danger by his manner of operating the engine. Wrong of this sort has been probably characterized as the equivalent of universal malice; to its existence the specific intent to injure any particular person is not essential. Weatherly v. N. C. & St. L. Ry. Co., 166 Ala. 575, 51 South. 959. This court has frequently held that to the implication of wantonness it is essential that the act done, or omitted should be done or omitted with a knowledge and a present consciousness that injury will probably result. L. & N. R. R. Co. v. Brown, 121 Ala. 226, 25 South. 609. Wantonness of that character is the moral and legal equivalent of intentional wrong, and rests upon the just apprehension, with which the wrongdoer is charged, not of a mere possibility, but of a probability, a likelihood, that untoward consequences will ensue to some one, and this probability, this likelihood, must have support and foundation in a reasonable interpretation of the evidence."

[4, 5] A careful study of this record convinces the unbiased judicial mind that the engineer in charge of this train was guilty of no such wanton conduct as here described. The overwhelming preponderance of the testimony is convincing to our minds that this accident occurred as a consequence, not of any wanton conduct of the engineer, but of the reckless and indifferent manner in which young Rush approached this crossing, and that the train in fact was being run at the usual and customary rate of speed, and that the usual signals were given. As said by this court in Twinn Tree Lumber Co. v. Day, 181 Ala. 565, 61 South. 914:

"We are not unmindful of the rules by which this court is governed in the determination of questions of this character. The trial judge, who hears the witnesses, and sees their demeanor on the stand, has a better opportunity than we can have to judge of the weight and credibility of oral testimony, and on appeal great respect is paid to his judgment. But this court has not renounced its duty nor neglected its power to revise the verdicts of juries and the conclusions of trial judges on questions of fact, where, in our opinion, after making all

proper allowances and indulging all reasonable intendments in favor of the court below, we reach a clear conclusion that the finding and judgment are wrong."

Such is our conclusion here, and the judgment will consequently be reversed, and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and MILLER, JJ., concur.